UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20209-CR-ALTONAGA/Goodman

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LUIS FERNANDO REYES,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court at a March 29, 2019 Hearing, on Defendant, Luis Fernando Reyes's ("Reyes['s]") Motion to Dismiss Indictment for Violation of his Sixth Amendment Right to a Speedy Trial [ECF No. 64] ("Mot."), filed February 28, 2019, with supporting exhibits [ECF Nos. 64-1 to 64-20].  The Government filed its Response to Speedy Trial Motion [ECF No. 66] ("Opp'n") with supporting exhibits [ECF Nos. 69-1 to 69-3], to which Defendant filed a Reply [ECF No. 69] ("Def's Reply").  Following the March 29 Hearing, the parties filed additional documents for consideration.  (*See* Government's Notice of Filing [ECF No. 77] ("Gov't's Notice"); Defendant's Notice of Filing . . . [ECF No. 78] ("Def's Notice"); Defendant's Response . . . [ECF No. 88]; and the Government's Reply [ECF No. 89] ("Gov't's Reply")).  The Court has carefully considered the parties' written submissions, the testimony and arguments presented at the March 29 Hearing, and applicable law.  For the following reasons, the Motion is denied.

# I.     BACKGROUND

## A.  Introduction

On April 3, 2014, the grand jury returned an Indictment [ECF No. 3] charging Reyes, Jose Orlando Sanchez Cristancho ("Sanchez"), Andrea Marroquin ("Marroquin"), and Sergio Hernan Perdomo Lievano ("Perdomo") with conspiracy to commit wire and bank fraud in violation of 18 U.S.C. section 1349 (Count 1); several counts of bank fraud against Sanchez, Marroquin, and Perdomo in violation of 18 U.S.C. section 1344 (Counts 2–5); money laundering by Marroquin in violation of 18 U.S.C. section 1956(a)(2)(A) (Counts 6–7); and money laundering conspiracy by Sanchez and Marroquin in violation of 18 U.S.C. section 1956(h) (Count 8). (*See generally* Indictment).  The offense conduct is alleged to have taken place from 2003 through October 2011.  (*See id.* 3).  An arrest warrant [ECF No. 6] for Reyes was entered on April 3, 2014. Defendants were placed on fugitive status on April 28, 2014.  (*See* Notice [ECF No. 8]).

On March 2, 2018, the case was unsealed (*see* Order [ECF No. 9]), a year after Sanchez's arrest in Colombia in March 2017 (*see* Opp'n 2) and his initial appearance (*see* Minute Order [ECF No. 10]).   Marroquin and then Reyes were arrested in January 2018 in Colombia; and after 11 months in detention in Colombia, Reyes was extradited to the United States and arrived here in December 2018.  (*See* Opp'n 2).  Reyes had his initial appearance on December 13, 2018 (*see* Minute Order [ECF No. 43]); was arraigned on January 3, 2019 (*see* Minute Order [ECF No. 50]); filed his first Unopposed Motion to Continue Trial [ECF No. 59] on January 29, 2019; and then filed the present Motion to Dismiss on February 28, 2019.

## B.  The Parties' Written Briefing

In his Motion, Defendant states the Government "has no justification for failing to prosecute this case for almost five (5) years after Mr. Reyes' indictment."  (Mot. 1).  According to

Defendant, the "Government knew of Mr. Reyes' whereabouts and had ample opportunities to arrest and extradite him," and the "inordinate and unjustifiable delay" he "has been subjected to is a violation of his Sixth Amendment right to a speedy trial." (*Id.*). To evaluate whether there has been a violation of the constitutional right to speedy trial, the Court must necessarily engage in a fact-intensive inquiry. That is what follows.

Reyes, a U.S. citizen, left the United States and moved to Colombia before the return of the Indictment. Beginning in December 2008, he lived in Colombia full-time as a pilot. (*See id.* 2). He worked as a commercial pilot for Rio Sur S.A. from July 2009 until his arrest in January 2018; possessed an American pilot's license that references his Colombian pilot's license by number; and traveled from Colombia to many foreign countries while in possession of a Colombian Cedula through which the U.S. Government could have located him with little effort. (*See id.* 4–5). Using his own name, Reyes purchased residences in Colombia; maintained bank accounts and credit cards in Colombia; obtained a cellphone number he has to this day and which the Government's witness, Paola Wagener ("Wagener") knows; maintains health insurance; and had Facebook and Instagram accounts where he routinely posted photos of himself showing his whereabouts. (*See id.* 3). Finally, Reyes had constant contact with the U.S. Government after the Indictment, such as at the U.S. Consulate in Mexico and the U.S. Embassy in Colombia. (*See id.* 5–6).

Notwithstanding all this available information, and "knowing Mr. Reyes' exact location, the Government did not seek to arrest Mr. Reyes until approximately December 20, 2017, when it filed a provisional arrest warrant with the Colombian Government." (*Id.* 6). Reyes emphasizes the alleged conspiracy ended in 2011, years before the Indictment was returned in 2014 (*see id.* 6); and the inordinate delay has secured for the Government a tactical advantage, while he suffers prejudice "given the likelihood that witnesses and evidence" are "unidentifiable and unavailable

after all these years" (*id.* 18).  Reyes spent 11 months in pre-trial detention awaiting extradition. (*See* Def's Reply 10).  He states he has lost access to cellphones containing text messages with the Co-Defendants and unindicted co-conspirators, which may assist in his defense by demonstrating his lack of knowledge or intent.  (*See id.* 11).  Reyes supports these assertions with documentary proof attached to his written briefing, as well as post-Hearing documents.

In its Response, the Government explains its criminal investigation extended far beyond the activities described in the Indictment.  (*See* Opp'n 3).  Sanchez was a major Colombian drug kingpin in the 1980s and 1990s, leading a drug trafficking organization that shipped airplane loads of cocaine from Colombia and Mexico to the United States.  (*See id.*).  After Sanchez was indicted in 1999 for money laundering, he provided substantial assistance to the United States, served his prison sentence, and was allowed to remain in the United States.  (*See id.*).  Several years later, the Drug Enforcement Administration ("DEA") received information Sanchez was moving large sums of drug money from Colombia to the United States; and investing the money in Florida real estate through intermediaries, shell corporations, the use of straw buyers, and fraudulently-obtained loans.  (*See id.*).

The DEA's investigation revealed Sanchez's one-time romantic partner, Marroquin, was involved in the mortgage fraud and money laundering schemes.  (*See id.* 4).  Marroquin is the daughter of a since-murdered major Colombian drug kingpin, and she was considered a significant target because of the number and magnitude of her real estate transactions and laundering of large sums of drug money in South Florida.  (*See id.*).  She incorporated at least 19 Florida corporations, and agents identified more than 50 corporations and 50 real estate transactions that had to be examined.  (*See id.*).  Subpoenas for contracts, closing records, and financial transactions were

obtained, resulting in discovery which consists of approximately 7,000 pages relevant to this Indictment alone.  (*See id.* 5).

The overall investigation involved more than the four Defendants named in this Indictment and resulted in separate cases, since concluded.  (*See id.*).  Defendants' alleged money launderer, Diego Castro, was not sentenced in his own case until December 2012, at which time his incentive to cooperate crystallized.  (*See id.*).  Other accomplices did not reach cooperation agreements with the United States until 2013, after which they testified before the grand jury.  (*See id.*).  As emphasized by the Government, the criminal activity described in the Indictment continued into 2011 and helps explain the pre-indictment delay.  (*See id.*).  The Government maintains any charges of pre-indictment delay, therefore, are easily dismissed given the complexity of the criminal conduct.

Turning to the charge of post-indictment delay, the Government explains the timing of Defendant's arrest was not the result of negligence, but rather, prosecutorial necessity.  (*See id.* 6).  As elucidated by the Government,

> Sanchez had been a major drug trafficker who . . . was continuing to illegally spend vast amounts of drug proceeds in the acquisition of real estate in South Florida. Andrea Marroquin had played only a minor role in the operations of her father's drug trafficking organization, but she had acquired great wealth . . . and was using it to buy one parcel of real estate after another . . . .
>
> In contrast, Luis Reyes was directly involved in a set of transactions involving only one condominium unit.  Accordingly, the successful prosecution of Sanchez and Marroquin was a much higher priority to the United States than the prosecution of Reyes.

(*Id.* (alterations added)).

Locating and arresting Sanchez and Marroquin proved difficult.  After the DEA, the Internal Revenue Service, Miami-Dade Police, and Homeland Security became involved in the investigation, and accomplices and straw buyers were questioned, Sanchez and Marroquin

disappeared from South Florida in mid-2009.  (*See id.*).  Soon after the Indictment, in mid-2014, agents received leads both might be in Panama; the Panamanian Police initiated records checks and surveillance.  (*See id.* 7).   In 2015, agents knew Sanchez and Marroquin were in Panama, but non-citizens with permanent resident status in Panama — as one or both were believed to be — are not subject to extradition.  (*See id.*).  By mid-2015, when the United States finally secured provisional arrest warrants from a Panamanian court, the two had left Panama.  (*See id.*).

At different times, agents received information the two traveled to Guatemala, the Dominican Republic, and Mexico; agents followed up unsuccessfully with authorities in those countries.  (*See id.*).  The searches for Sanchez and Marroquin had to be handled with circumspection, as the former drug kingpin Sanchez still had much wealth and influence, and Marroquin was similarly well-connected.  (*See id.*).  The Government did not want them to be tipped off in advance of their capture.  (*See id.*).  A vetted Colombian National Police unit was enlisted to aid in the search.  (*See id.*).

Notices were posted in the National Criminal Information Center ("NCIC") system, and a Treasury Enforcement Communication System ("TECS") lookout was posted to inform agents if Defendants crossed international borders or made airline flight reservations.  (*See id.*).  By late 2015, the Government had secured Red Notices issued by Interpol; if a defendant is arrested in a foreign country, a red notice would cause U.S. arrest warrants and requests for extradition to show up in processing.  (*See id.* 8).

While the search for Sanchez and Marroquin was active, the Government delayed arresting Reyes.  (*See id.*).  Had Reyes been arrested first, the Indictment would have been unsealed, and Sanchez and Marroquin "would have undertaken even more intensive efforts to conceal their

whereabouts." (*Id.*).  The Government made a "reasoned decision" to capture Sanchez and possibly Marroquin before arresting Reyes.  (*Id.* 9).

On March 25, 2017, Colombian police spotted and arrested Sanchez while effectuating an international arrest warrant for a different fugitive.  (*See id.*).  Sanchez's arrest appears to have contributed to the delay in apprehending Marroquin; she was finally arrested on January 18, 2018 after Colombian police located her after months of additional investigation.  (*See id.*).  Reyes was arrested the day after Marroquin.  (*See id.*).

In his Reply, Defendant states: while the alleged conspiracy ended in 2011, the Indictment was not returned until April 2014, resulting in a two-and-a-half-year pre-Indictment delay (*see* Def's' Reply 3); the Government knew Sanchez and Marroquin were in Panama, but failed to file an Interpol Red Notice until late 2015, over a year after the Indictment (*see id.* 1); after Sanchez's arrest in March 2017, Reyes was not arrested until almost ten months later, on January 19, 2018 (*see id.* 2); and there are large gaps in time during which the Government did nothing to locate or arrest Sanchez or Marroquin (*see id.* 7).

### C.  March 29, 2019 Hearing

At the Hearing, the Government presented the testimony of retired DEA Special Agent Robert Ayoob and Ronald Bryan, special agent with the Internal Revenue Service criminal investigations. Agent Ayoob was the lead agent of the investigation into Reyes and his Co-Defendants, an organized crime investigation called Operation Friendly Skies.  He confirmed well over 50 people were targets of the investigation, including straw buyers, real estate attorneys, cooperating co-conspirators, and mortgage brokers; and more than 10 properties and 25 or more dummy corporations were involved.  Diego Castro was indicted and pled guilty and provided documents.  Marroquin was also indicted.

Suspect Paola Wagener cooperated and provided a complete statement in November 2013, although Agent Ayoob had interviewed her sometime before that.  She provided directly incriminating information about some of the Defendants named in the Indictment.  Sandra Duffey, her sister, also provided information.  The investigation was continuous and ongoing.

Sanchez and Marroquin were the most important targets of the Indictment.  Agent Ayoob confirmed Sanchez was a well-known drug trafficker and active drug kingpin from the 1990s into the 2000s.  Marroquin is the daughter of Edgar Marroquin, and former wife of Jorge Figueroa, a drug trafficker who shot and killed a DEA agent in 1988.  Reyes was a friend of Jorge Figueroa. Edgar was shot and killed in Venezuela, and Marroquin inherited his wealth.

During the investigation, Agent Ayoob learned Marroquin moved to the United States, investing money in real estate, including perpetrating mortgage fraud.  Reyes was married to Marroquin's half-sister, Ruth Bohorquez in Colombia, and was previously married to Marroquin. Reyes was not a "high priority person."  Reyes was identified as a target in the investigation in 2010 or 2011.

Agent Ayoob knew Marroquin and Sanchez were living in the United States in 2008.  In 2011, Agent Ayoob noticed they traveled to other countries, and because agents were speaking to other targets, Agent Ayoob thought they had left the United States surmising they were under investigation.

Agent Ayoob retired in January 2014, just before the Indictment was returned.  He opined if Reyes had been arrested before Marroquin and Sanchez, they would likely have learned they were named in the Indictment. He believes Marroquin and Sanchez may have fled to other countries where the DEA would be unable to locate them.  Marroquin and Sanchez had the means to travel to other countries and hide their whereabouts from law enforcement.

IRS Special Agent Bryan became involved in Friendly Skies in 2012 to 2013 and took over as lead agent when Agent Ayoob retired.  He was responsible for coordinating Defendants' arrests. Agent Bryan reiterated that Sanchez and Marroquin were the priority targets and agreed if Reyes had been arrested first, Sanchez and Marroquin would likely flee.

Regarding efforts to apprehend Sanchez and Maroquin immediately after the Indictment was returned in April 2014, Agent Bryan entered Sanchez's and Marroquin's names into the TECS database; if either entered or left any port of entry of the United States, alerts would issue.  He enlisted the assistance of the Department of Homeland Security.  A Department of Homeland Security agent was assigned to the case, tracking to see if either was traveling to other countries. More than a year later, in June 2015, Agent Bryan applied for assistance from Interpol.  Interpol issued Red Notices in October 2015.

At some unknown time before the Red Notices, Agent Bryan had obtained information Sanchez and Marroquin might be in Panama, so he contacted the attachés assigned to Panama and Colombia, notifying them of the Indictment and arrest warrants.  Panamanian and Colombian authorities started to search for the two.

In 2014 and 2015, Agent Bryan tried to obtain a provisional arrest warrant for Marroquin, having learned from the Panamanian vetted unit that her children were attending school there.  The Washington, D.C. Office of International Affairs handled the process of obtaining a provisional arrest warrant for an arrest to take place in Panama, and from there, the provisional warrant was communicated to the consular section in Panama.  According to Agent Bryan, Panama will honor a U.S. arrest warrant, but if the individual has immigration status in Panama, the process becomes more difficult.  Sanchez had immigration status in Panama, but he could not be located.  It was discovered Marroquin had left Panama and had relocated to the Dominican Republic.

Sometime in 2015, Agent Bryan received information Marroquin might be in Guatemala. He was unsuccessful in locating her there.

After October 2015, Agent Bryan started searching for the two in Colombia.  The IRS and Homeland Security Investigations have vetted units in Colombia, and those units tried to locate Sanchez and Marroquin.  Agent Bryan relied on Colombian police, receiving status reports from time to time based on active surveillance taking place in Bogota and Medellin.

In 2016, a Colombian vetted unit located Sanchez after he applied for medical insurance and surveillance was conducted.  In March 2017, Interpol, in conjunction with the French police, were engaged in enforcement activity and Sanchez just happened to be there; according to Agent Bryan, Sanchez was "in the wrong place, at the right time."  When Sanchez was arrested in March 2017, there was much publicity, although the publicity centered on Sanchez and not Marroquin or Reyes.

Agent Bryan testified the Colombian authorities kept looking for Marroquin in Colombia, because she had been identified as having business there.  While Agent Bryan's testimony focused almost exclusively on the efforts to locate Sanchez and Marroquin, he later clarified that at the time Colombian authorities were enlisted to aid in the search for Sanchez and Marroquin, they were also alerted to Reyes and the fourth Defendant, Perdomo.  According to Agent Bryan, he and his Colombian team were "always looking for" Reyes from the time of the Indictment, including doing database and TECS checks every couple of months.

Efforts to locate Marroquin and Reyes in Colombia continued.  Marroquin was arrested in January 2018, and the vetted unit arrested Reyes the following day.  Agent Bryan does not know how Reyes was located and arrested in Colombia.

As to efforts to locate Reyes, Agent Bryan testified the attachés in Colombia, Panama, and Colombia were given copies of the Indictment and four arrest warrants immediately after the Indictment was returned in 2014.  A Red Notice was filed in June 2015.  Agent Bryan engaged in quarterly database checks of NCIC and Accurint to locate Reyes.  No U.S. addresses showed up.

After Sanchez's March 2017 arrest, and once Agent Bryan had a possible address for Reyes, he started the paperwork for Reyes's provisional arrest warrant.  In October 2017, the vetted unit located Reyes in Colombia.  Two days later, in early November 2017, the Government started preparing a provisional arrest warrant for Reyes since he is a U.S. citizen.

In December 2017, Marroquin and her daughter left Bogota and went to Cartagena.  Reyes left Bogota as well.  In January 2018, after Marroquin and Reyes returned to Bogota, the vetted unit arrested Marroquin, and the following day, Reyes.

Reyes testified at the Hearing, confirming he could not recall what kinds of messages were contained in a Blackberry phone he owned during the time relevant to the Indictment, which he no longer has and cannot locate.  All he can remember is the phone contained conversations with the Co-Defendants pertaining to the real estate transactions relevant to the crimes charged in the Indictment.

### D.  Post-Hearing Documents

Following the evidentiary hearing, the Government submitted documentation in support of its position it diligently searched for Sanchez and Marroquin, as well as Reyes.  In this regard, the Court takes notice of the following events:

- An April 25, 2014 email from the U.S. Embassy in Panama to Agent Bryan informing as to Sanchez and Marroquin's whereabouts.  (*See* Gov't's Notice 3).

CASE NO. 14-20209-CR-ALTONAGA

- A May 28, 2014 email from the attaché in Panama to Agent Bryan about the "the three subjects under the sealed indictment" and information regarding Panamanian immigration requirements for their expulsion.  (*Id.* 4).

- A November 1, 2016 email from Agent Bryan to South American attachés asking, "Any updates on any of the fugitives or Luis Reyes?" and a November 2, 2016 email response "they are working on it."  (*Id.* 5).

- A November 3, 2016 email from the deputy attaché to Agent Bryan reporting as to Reyes, "we recently completed a judicial assistance request, which is being submitted by the JudAtt to the International Cooperation Section of the Colombian AG.  This will be shortly assigned to be [sic] a prosecutor for the necessary work and judicial orders to be issued."  (*Id.* 6).  The email contains additional information about efforts to locate Sanchez and Marroquin, describing efforts of the vetted unit. (*See id.*).

- A December 15, 2016 email from Agent Bryan to the attachés, stating "Also, don't forget about LUIS REYES, the US citizen who is married to MARROQUIN's sister.  He is also in Indicted [sic] and should be easy to locate.  I doubt he is hiding." (*Id.* 7).  In an email response of the same date, the deputy attaché states: "I will tell the prosecutor that we want them [sic] both Marroquin and Sanchez at the same time.  We also requested assistance in locating Reyes and directed the request to the same prosecutor and vetted unit agent."  (*Id.* 7).

- A February 15, 2017 email from Agent Bryan to the attaché containing descriptions of the efforts to find Sanchez and Marroquin, and in a response of the same day, an

email from the attaché to Agent Bryan, stating, "One more thing.  They have several leads on Reyes and felt that they would have his location shortly." (*Id.* 8).

- A June 14, 2017 email from Agent Bryan to the deputy attaché, recapping the status of Operation Friendly Skies and inquiring as to Marroquin and Reyes.  (*See id.* 10).  An email response of the same day states, "I'll contact the vetted unit coordinator and ask for an update on Marroquin and Reyes."  (*Id.* 11).

- A July 14, 2017 email from Agent Bryan to the attachés asking, "Also, anything on the location of LUIS REYES?"  (*Id.*).

- An August 15, 2017 email from the deputy attaché to Agent Bryan providing an update on the "fugitives in Colombia;" and as to Reyes, stating, "They have found potential addresses of the subject and are awaiting a judicial order from the prosecutor do to surveillance."  (*Id.* 12).

- An August 25, 2017 Accurint report for Reyes processed by IRS-Criminal Investigation.  (*See id.* 13).

- An October 30, 2017 email from the deputy attaché to Agent Bryan advising Reyes was located, asking how he wants to proceed on Reyes, and describing continued surveillance of Marroquin.  (*See id.* 14).  Agent Bryan responds to the deputy attaché the same day, stating the U.S. prosecutor instructed him to start working on the paperwork to extradite "him" back to the United States, seemingly for Reyes, who is noted as being a U.S. citizen.  (*Id.*).

- A December 10, 2017 email from Agent Bryan to the deputy attaché, stating both Marroquin and Reyes have been located, and "We should really get the PAW going on both of them as soon as possible."  (*Id.* 15).

- A December 15, 2017 email from the U.S. prosecutor regarding "coordinating in Colombia;" and a December 18, 2017 email from the deputy attaché regarding efforts to "get the PAW," stating, "They have also positively identified the location of Reyes and can execute an arrest on him if the PAW is sent and processed." (*Id.* 16).

- A January 2, 2018 email from the deputy attaché to Agent Bryan stating the PAWs for Marroquin and Reyes are active, and both should be traveling back to Bogota. (*See id.* 17).

- A January 10, 2018 email from the deputy attaché to Agent Bryan providing an update on Marroquin and stating, "Reyes is back in Bogota and we have him pretty much ready to arrest whenever we want." (*Id.* 18).

Defendant responded to the foregoing post-Hearing documentation with additional documents showing: Reyes had no active cases or warrants in any Colombian national databases as of March 2018; Reyes's 2017 flight plans; and a March 2019 report from Colombian National Police showing Reyes did not have any criminal cases or warrants in the Colombian records system. (*See* Def's Notice [ECF Nos. 78-1 to 78-3]).

## II.     ANALYSIS

In *Barker v. Wingo*, the United States Supreme Court established the framework for evaluating when a criminal defendant's case should be dismissed for a violation of the Sixth Amendment's right to a speedy trial. *See* 407 U.S. 514, 530 (1972). The Supreme Court identified four factors courts should balance in determining whether a defendant has been deprived of this right: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *See id.* at 530–32. "[T]hese factors have no talismanic

qualities; courts must still engage in a difficult and sensitive balancing process." *Id.* at 533 (alteration added; footnote call number omitted).

In the Eleventh Circuit, a defendant does not need to prove actual prejudice if the first three factors all weigh heavily against the Government. *See United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003) (holding defendant must "demonstrate actual prejudice" because "the first three *Barker* factors do not uniformly weigh heavily against the government."). "When weighing a factor[,] 'there is no hard and fast rule to apply . . . , and each case must be decided on its own facts.'" *United States v. Jimenez*, 756 F. App'x 933, 937 (11th Cir. 2018) (alteration in original; quoting *United States v. Clark*, 83 F.3d 1350, 1354 (11th Cir. 1996)).

### A. Length of the Delay

The first factor is "a double enquiry," wherein the court first decides whether the delay is long enough — that is, whether "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay" — to trigger analysis of the *Barker* factors. *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (citing *Barker*, 407 U.S. at 530–31). "[I]f a delay is not presumptively prejudicial, a defendant's Sixth Amendment right is not deemed violated and the remaining factors need not be considered." *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999) (alteration added; citation omitted); *see also United States v. Struyf*, 701 F.2d 875, 878–79 (11th Cir. 1983) ("We hold that the seven month delay in this case was not 'presumptively prejudicial' under the first prong of the *Barker* test. Accordingly, we need not inquire into the other factors." (citation omitted)).

Due to "the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31 (footnote call number omitted). Notably, "delays exceeding one year are

generally found to be 'presumptively prejudicial.'" *Clark*, 83 F.3d at 1352 (citation omitted); *see also Dunn*, 345 F.3d at 1296.  In *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), the Eleventh Circuit concluded that a two-year delay between indictment and trial warranted application of the four-factor *Barker* analysis.  *See id.* at 1337 (footnote call number omitted). Once the first factor triggers a speedy trial analysis, "it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government." *Id.* at 1339 (citations omitted).

Here, the alleged criminal activity ended in 2011, but the Indictment was not returned until April 2014, resulting in a more than two-year pre-indictment delay.  The post-indictment delay is a delay of three and three-fourths years, or 45 months, from April 2014 to the date of arrest, January 2018.

As to the pre-indictment delay, the Government asserts the duration of the investigation was a result of its breadth and complexity.  (*See* Opp'n 4).  Marroquin alone incorporated 19 Florida corporations, and agents identified more than 50 corporations and 50 real estate transactions the activities of which had to be examined, including the review of documentation received following the issuance of subpoenas.  (*See id.* 4–5).  The discovery relevant to this Indictment exceeded 7,000 pages, and the overall investigation exceeded the scope of this Indictment.  (*See id.* 5).

"Only pretrial delay following a person's arrest, charge, or indictment is relevant to whether the Speedy Trial Clause of the Sixth Amendment is triggered." *Ingram*, 446 F.3d at 1339 (citing *United States v. Lovasco*, 431 U.S. 783, 788–89 (1977)).  But "[o]nce the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the

Government." *Id.* (citations omitted). "Pre-indictment delay is accounted for if it is 'inordinate.'" *United States v. Oliva*, 909 F.3d 1292, 1304 (11th Cir. 2018) (quoting *Ingram*, 446 F.3d at 1339). Whether delay is inordinate may depend on whether the crime being investigated is complex rather than simple. *See id.* at 1304–05 (finding two-year pre-indictment delay was not inordinate where the investigation included 25 witnesses located in numerous states, nine suspects, 100 exhibits, search warrants, shoe-tread analysis, and more). Courts tolerate delay less in the investigation of ordinary street crimes as compared to "a serious, complex conspiracy charge." *Id.* (internal quotation marks and citation omitted). Where pre-indictment delay is not inordinate, that time is not counted in the speedy-trial analysis. *See id.*

The Court agrees with the Government the Indictment is the result of a complex investigation, involving the issuance of subpoenas targeting numerous transactions, companies, and participants; including, at later stages, working with cooperating witnesses. The investigative work produced extensive documentation that had to be reviewed and analyzed. The more than two years that elapsed from the conclusion of the criminal activity to the return of the Indictment in 2014 is therefore not counted.

Reyes's speedy trial clock began ticking in April 2014, when he was indicted. It ran for three years and nine months, until his arrest in January 2018 in Colombia. This delay is presumptively prejudicial, *see Ingram*, 446 F.3d at 1336 (explaining a delay exceeding 12 months is presumptively prejudicial), extending well beyond the one-year minimum necessary to satisfy the presumption, *see United States v. Neda*, 710 F. App'x 807, 810–11 (11th Cir. 2017) (noting the Government conceded the five-year delay was presumptively prejudicial).

Because the length of the delay is presumptively prejudicial, the Court must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial

examination of the claim." *Id.* at 811 (quoting *Doggett*, 505 U.S at 652).  In other words, "the longer the delay, the more heavily it weighs against the government."  *Id.* (citing *Doggett*, 505 U.S. at 657).  The almost four-year delay weighs heavily against the Government.  *See Ingram*, 446 F.3d at 1338–39.  The Court must therefore turn to the remaining three *Barker* factors.

### B. Reasons for the Delay

As to the second factor, "the conduct of the government must be weighed against the conduct of the defendant."  *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986) (citing *Barker*, 407 U.S. at 530).  The Government "bears the burden of establishing valid reasons for the delay."  *United States v. Villarreal*, 613 F.3d 1344, 1351 (11th Cir. 2010) (citing *Ingram*, 446 F.3d at 1337).  "The Sixth Amendment mandates only a 'diligent, good-faith effort' on behalf of the government to find the defendant and bring him or her to trial."  *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018) (citing *Bagga*, 782 F.2d at 1543).  "Where the missing individual is the defendant, the government is not required to exhaust all conceivable avenues in finding him."  *United States v. Spaulding*, 322 F. App'x 942, 946 (11th Cir. 2009) (internal quotation marks and citation omitted).

"[D]ifferent weights should be assigned to different reasons" given for the delay.  *Barker*, 407 U.S. at 531 (alteration added).  For example, a "deliberate attempt to delay trial to hamper the defense weighs heavily against the government."  *Jimenez*, 756 F. App'x at 936 (citation omitted).

Conversely, a "neutral reason" like "negligence" "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."  *Barker*, 407 U.S. at 531.  But neutral reasons do "not necessarily tip the scale in favor of the defendant, particularly where the defendant was at liberty and outside the jurisdiction where the indictment was returned."  *Bagga*, 782 F.2d

at 1544 (citations omitted). And when the Government takes reasonable and diligent steps to locate a defendant, the reason is, at worst, neutral. *See United States v. Lamar*, 562 F. App'x 802, 805 (11th Cir. 2014). A valid reason that serves a legitimate government purpose justifies reasonable delay. *See Doggett*, 505 U.S. at 656.

Not surprisingly, the Government argues its reasons for the delay were valid, stating *United States v. Hayes* "is squarely on point." (Opp'n 10). In *Hayes*, the Government had made extensive efforts from June 1987 to November 29, 1991, to locate and extradite the co-defendant. *See* 40 F.3d 362, 366 (11th Cir. 1994). The Eleventh Circuit concluded the Government had a valid reason for sealing the indictment and delaying the defendant's trial for almost five years while working with foreign governments to locate, arrest, and extradite his co-defendant who might have "frustrated . . . attempts to secure his arrest and deportation if he were aware of" the indictment. *Id.* at 365 (alteration added). Under those circumstances, the delay in prosecuting the defendant did not weigh against the Government. *See id*. at 366.

Finally, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." *Villarreal*, 613 F.3d at 1351 (citation omitted). If the Government does not engage in a good-faith effort to locate a defendant, this factor weighs heavily against the Government. *See United States v. Dennard*, 722 F.2d 1510, 1513 (11th Cir. 1984). But where the period of delay is "justified by the government's attempt to find the fugitive co-defendant [], and there is no evidence of bad faith by the government in doing so," courts "cannot say the second factor weighs heavily against the government." *United States v. Woodley*, 484 F. App'x 310, 319 (11th Cir. 2012) (alteration added; citation omitted); *see also United States v. Davenport*, 935 F.2d 1223, 1240 (11th Cir. 1991) ("While the government arguably may be responsible under *Barker* for the delay in this case, we

cannot find that that responsibility weighs heavily against the government.  There is absolutely no evidence of bad faith by the government.  The reasons for delay in this case were, at worst, neutral reasons.").

In the intervening almost four years from the time of the Indictment's return in 2014 to Defendant's 2018 arrest in Colombia, by its own admission, the Government focused its efforts on locating and arresting Sanchez and Marroquin.  Agents Ayoob and Bryan both confirmed their preference for arresting the more culpable Defendants named in the Indictment before attempting to arrest the less culpable Defendants for fear the more culpable ones would flee after learning about the sealed Indictment.

The Government wrote in its Opposition that notices were posted in the NCIC criminal records system, and a TECS lookout was posted to inform agents if Defendants crossed international borders or made airline flight reservations.  (*See* Opp'n 7).  The Government also represented that by late 2015, it had secured Red Notices issued by Interpol.  (*See id.* 8).

Other than a May 2014 email from the Panamanian attaché to Agent Bryan about the "three subjects under the sealed indictment," there is no further written communication mentioning Reyes until November 1, 2016 — a delay of two years and seven months.  (Gov't Notice 4–5).  Reyes's name reappears in a December 15, 2016 email from Agent Bryan, stating Reyes "should be easy to locate.  I doubt he is hiding."  (*Id.* 7).  Additional written communications between the Government and the attachés regarding Reyes take place in 2017, with a December 2017 email finally acknowledging, "We really should get the PAW going on both [Marroquin and Reyes] as soon as possible."  (*Id.* 15 (alteration added)).

The Government is correct to rely on *Hayes*.  The timeline of events, reconstructed from the parties' written submissions, the testimony, and the post-Hearing documents, reveal the

Government's actions and inactions resulted from a professed desire to locate and apprehend Sanchez and Marroquin before actively pursuing Reyes. The Government was operating on a belief Sanchez and Marroquin would flee if Reyes was arrested first.

To be sure, Defendant correctly points out Sanchez and Marroquin, without knowing of the Indictment, had *already* proven difficult to apprehend and arrest. Indeed, Reyes has some reason to cast doubt on the Government's rationale, for the "Government's argument is circular[.] [I]t claims that it violated Mr. Reyes' 6th Amendment right so that Sanchez and Marroquin, who were already on the run and hiding, wouldn't run and hide." (Def's Reply 7 (alterations added)). The Court also notes the reason for the Government's law enforcement techniques is not altogether supported by the record, which illustrates an uptick in requests for information regarding Reyes commencing in November 2016, more than four months before Sanchez was fortuitously apprehended on March 25, 2017.

Nevertheless, the Government has supplied substantial evidence corroborating its prosecutorial decision to exclusively pursue Sanchez and Marroquin before arresting Reyes. While Sanchez and Marroquin may have *surmised* an investigation was ongoing when they first left the country, arresting Reyes first would have certainly jeopardized the sealed nature of the Indictment, thus tipping off Sanchez and Marroquin *entirely*. What is more, the Government engaged in good-faith efforts to advance its stated interest to prioritize arresting the more culpable Co-Defendants first. Therefore, with respect to the Government's actions (or inactions) during the initial period of delay from April 2014 until November 2016, the second *Barker* factor does not weigh heavily against the Government. *See Hayes*, 40 F.3d at 366 ("Even though these efforts caused a lengthy delay in prosecuting Hayes, the Government's persistence in trying to locate [the co-defendant] was not unreasonable." (alteration added)); *see also Jimenez*, 756 F. App'x at

938 (holding the Government's decision to not unseal an indictment earlier was "at worst" merely "a neutral reason that weighed 'only slightly against' the government" where there was "absolutely no evidence of bad faith by the government . . . ." (internal quotation marks and citation omitted; alteration added).

The Court next turns to the reasonableness of the Government's conduct since November 2016.  As stated, since November 2016, Defendant was readily accessible, but the Government failed to effectuate Reyes's arrest for 14 months, until January 2018.   The Government knew or should have known of Defendant's whereabouts as evidenced by Defendant's:

- American pilot's license that references his Colombian pilot's license by number;

- Travel from Colombia to many foreign countries while in possession of a Colombian Cedula through which the U.S. Government could have located him;

- Purchases of residences in Colombia;

- Bank accounts and credit cards in Colombia under his own name;

- Cellular phone that he has to this day and which the Government's witness, Wagener knows;

- Facebook and Instagram accounts where he routinely posted photos of himself showing his whereabouts;

- Contacts with the U.S. Government after the Indictment, such as at the U.S. Consulate in Mexico and the U.S. Embassy in Colombia.

(*See* Mot. 4–6).

The Government's preference for arresting less culpable defendants after detaining more culpable ones cannot justify the Government's tactics after March 2017, when Sanchez had already been arrested.  This record therefore points to negligence by the Government.  *See United States*

*v. Velazquez*, 749 F.3d 161, 177 (3d Cir. 2014) ("If authorities choose to ignore available leads about a suspect's whereabouts in favor of other tasks, they may nonetheless be found negligent within the context of the speedy trial right.").

Of course, "negligence . . . falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 657 (alteration added); *see also United States v. Garza*, 222 F. App'x 947, 948 (11th Cir. 2007) (noting ATF agent's initial physical surveillances of the defendant's father's residence, but ensuing failure to make any further surveillances or visits to the residence for over five years). "The longer the delay," and the greater the length of time the Government did nothing after an indictment is returned as compared to the efforts it did undertake, "the more heavily the government's negligence weighs against it." *Spaulding*, 322 F. App'x at 946 (citing *Doggett*, 505 U.S. at 657–58).

Here, the record reveals the Government implemented robust and diligent efforts beginning in November 2016, which ultimately resulted in Reyes's and Marroquin's arrests in January 2018. For this 14-month period, the Government appears to have been diligent in communicating to the attachés about Reyes and in securing provisional arrest warrants, running Accurint reports, and engaging in surveillance. On balance, the Government's actions and inactions lie in the middle ground between diligence and bad faith, but closer to diligence than bad faith. *See Spaulding*, 322 F. App'x at 946–947. In short, this is not a case in which the Government failed to perform its investigation "diligently." *Ingram*, 446 F.3d at 1339. The second *Barker* factor therefore weighs somewhat, although not heavily, against the Government with respect to the 14-month period from November 2016 until January 2018.

In sum, the initial period of delay from the time of the Indictment in April 2014 until November 2016 is accounted for by a reason the Eleventh Circuit in *Hayes* concluded was valid and did not hold against the Government — the need to first apprehend the more culpable Co-Defendants.  And as to the period from November 2016 until Defendant's arrest in January 2018, the Government has satisfied its burden of showing it made a "diligent, good-faith effort" to locate the Defendant.  *Smith v. Hooey*, 393 U.S. 374, 383 (1969).  This second factor thus weighs only somewhat against the Government.

### C. Defendant's Assertion of his Right to a Speedy Trial

Defendant unquestionably asserted his right to a speedy trial.  There is no evidence Defendant knew of the Indictment prior to his arrest.  The Indictment was sealed until after Sanchez's arrest, and no witness testified Defendant learned he was named in the Indictment at any time before his arrest.  Defendant requested an express extradition, which is why he arrived before Marroquin.  (*See* Def's Reply 9).  The Motion was filed two months after Defendant's December 13, 2018 initial appearance, and less than one month after Defendant's January 29, 2019 Unopposed Motion to Continue Trial [ECF No. 59].  The Motion to Continue was sought to allow Defendant to prepare his defenses to the Indictment, including the present Motion, and obtain many of the documents supplied, many of which were in a foreign country and required translation. (*See* Def's Reply 10).

The third factor "assesses whether a defendant asserted his right to adjudication without unreasonable delay."  *United States v. Yehling*, 456 F.3d 1236, 1244 (10th Cir. 2006) (citation omitted).  *Cf. United States v. Register*, 182 F.3d 820, 828 (11th Cir. 1999) (where the defendant asserted his speedy trial right on two separate occasions, and on several occasions moved for continuance, third *Barker* factor did not weigh heavily against the Government); *United States v.*

*Lazzara*, 709 F. App'x 578, 581 (11th Cir. 2017) (per curiam) (noting the defendant asserted his speedy-trial right in a timely manner, but then signed a waiver of his speedy-trial right and moved for a continuance).  On the present facts, Defendant's singular request to continue his trial is not a basis for finding he "did not want a speedy trial."  *Barker*, 407 U.S. at 536; *see also United States v. Velez*, 05-20770-CR, 2009 WL 10710450, at *5 (S.D. Fla. Feb. 13, 2009) ("This is not a case where Velez's abuse of the motion and appellate process resulted in the very delay she is appealing. . . . Following [the Government's two-year] delay, Velez requested a continuance so she could prepare her case." (alterations added)).  The third *Barker* factor thus weighs heavily against the Government.

### D. Prejudice to the Defendant

The Court has concluded the first and third *Barker* factors weigh heavily against the Government, while the second factor does not.  When all three *Barker* factors do not all weigh heavily against the Government, a defendant "must demonstrate actual prejudice to succeed on his speedy trial claim."  *Villarreal*, 613 F.3d at 1355 (citation omitted); *Dunn*, 345 F.3d at 1296 (stating a defendant must show actual prejudice unless the first three *Barker* factors "all weigh heavily against the government." (internal quotation marks and citations omitted)).  A defendant may demonstrate actual prejudice in one of three ways: "(1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) possibility that the accused's defense will be impaired."  *Clark*, 83 F.3d at 1354 (citing *Doggett*, 505 U.S. at 654).

Oppressive pretrial incarceration has not taken place here.  As the Government notes, Defendant would have been detained in Colombia pending his extradition had Defendant been arrested earlier; it is part of the process for obtaining his presence in the United States following arrest in Colombia.  (*See* Opp'n 11).  The delay did not cause any additional anxiety and concern

25

by Reyes that would not have been occasioned by a timely arrest, detention in Colombia, and extradition.  Because Defendant was presumably unaware of the Indictment until his arrest, any anxiety and concern do not support a finding of actual prejudice.

Prejudice from "the inability of a defendant adequately to prepare his case skews the fairness of the entire system," and is "the most serious" of the interests the speedy trial right was intended to protect.  *Villarreal*, 613 F.3d at 1355 (citation omitted).  "[P]rejudice may be demonstrated through the death or disappearance of a witness or by a <u>defense</u> witness's inability to recall accurately events of the distant past."  *Machado*, 886 F.3d at 1082 (quoting *Barker*, 407 U.S. at 532; first alteration added).  As noted by the Government, "conclusory assertions of prejudice" and "unsubstantiated allegations of witnesses' faded memories" are insufficient to show prejudice.  (Opp'n 11 (quoting *Hayes*, 40 F.3d at 366)).  Defendant insists he is prejudiced by the delay because he will be forced to go back in time, from 2003 to 2011, to search for witnesses and evidence for his defense (*see* Def's Reply 10); and he has lost access to cellular phones containing messages with Co-Defendants and unindicted co-conspirators "which would have assisted" in his defense (*id.* 11).  Again, at the Hearing, Defendant could not recall what kinds of messages were in the phone he no longer has.

Defendant is charged with conspiracy to commit mortgage fraud and obtaining a re-finance loan on a condominium unit by means of a mortgage application he personally signed.  (*See* Opp'n 12).  Defendant has the application, in which he claims to earn $276,000 yearly as managing director of Quin Real Estate Investments, LLC.  (*See id.*).  During that year, he signed a federal income tax return claiming an annual gross business income of $39,733, with a net profit of $22,866, a copy of which he has been provided.  (*See id.*).  And the address for Quin Real Estate is a mailbox in a UPS store; the Government has given Defendant photographs of that location.

CASE NO. 14-20209-CR-ALTONAGA

(*See id.*).  Lastly, Defendant has been provided in discovery the name of a witness who will testify Quin Real Estate was a shell corporation used as a front for mortgage applications.  (*See id.*).

Given these directly incriminating documents, the vague reference to unknown text messages with Co-Defendants and unindicted co-conspirators amounts to a conclusory assertion of prejudice.  Defendant was unable to state how his communications with his Co-Defendants or others would be exculpatory or assist in refuting the written documentation as described by the Government.  Conclusory allegations of prejudice are insufficient to satisfy Defendant's burden. *See Hayes*, 40 F.3d at 366 ("This court has consistently held that conclusory allegations of prejudice, including allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice." (citation omitted)).  The prejudice factor therefore weighs against the Defendant.

### III.     CONCLUSION

The four *Barker* "factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."  *Barker*, 407 U.S. at 533 (footnote call number omitted).  Here, the first factor weighs heavily against the Government, the second factor weighs slightly against the Government, the third factor weighs heavily against the Government, and the fourth factor weighs against Defendant.

After carefully balancing the four *Barker* factors, the Court concludes the Government has not violated Defendant's Sixth Amendment right to a speedy trial.  *See Jimenez*, 756 F. App'x at 935–940 (affirming district court's conclusion that defendant's Sixth Amendment right to a speedy trial right was not violated where the first and third factors weighed heavily against the government, the second factor weighed "marginally against the government" and the defendant failed to show actual prejudice); *see also Neda*, 710 F. App'x at 812, 814 (affirming district court's

conclusion that defendant's Sixth Amendment right to a speedy trial was not violated even though the "government's negligence . . . spanned years and [was] counted against the government." (alterations added));

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, Luis Fernando Reyes's Motion to Dismiss Indictment for Violation of his Sixth Amendment Right to a Speedy Trial **[ECF No. 64]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 14th day of May, 2019.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record